# United States District Court

**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| JANNA ROBIN | § | |
| | § | |
| v. | § | Civil Action No. 4:16-cv-00576 |
| | § | Judge Mazzant |
| CITY OF FRISCO, TEXAS, AMY SMITH, | § | |
| GREG WARD, JOHN BRUCE, LAUREN | § | |
| SAFRANEK, and GEORGE PUREFOY | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendants' Motion for Summary Judgment (Dkt. #35). Having considered the relevant pleadings and evidence, the Court finds the motion should be granted in part and denied in part.

## BACKGROUND

Plaintiff Janna Robin worked as a detention officer for Defendant, the City of Frisco, Texas (the "City") from April 25, 2011, to August 11, 2014. For clarity, the Court will lay out Plaintiff's relevant chain of command. Plaintiff's co-worker, Tyler Peace ("Peace"), also worked as a detention officer. Defendant Amy Smith ("Smith"), the Detention Supervisor of the City jail, was both Plaintiff's and Peace's immediate supervisor during the relevant time period. Defendant Greg Ward ("Ward") is the Deputy Chief of Police for the City. Darren Stevens ("Stevens") is the Assistant Chief of Police, but is not named as a Defendant. Defendant John Bruce ("Bruce") is the Chief of Police for the City. Defendant George Purefoy ("Purefoy") is the City Manager for the City. Not a part of Plaintiff's chain of command but also named as a defendant is Lauren Safranek ("Safranek"), the Director of Human Resources for the City.

The facts giving rise to the allegations in the case began in July 2013, when Plaintiff was asked to complete Peace's training. This began a long history of animus between the two

detention officers. Plaintiff claims that while training Peace, he made certain derogatory comments regarding Plaintiff's gender and complained about her training method. Additionally, Plaintiff claims Peace made offensive racist comments regarding the acquittal of George Zimmerman in the Trayvon Martin criminal trial. In August 2013, Plaintiff complained about Peace's comments to Smith. Thereafter, Plaintiff was removed as Peace's trainer and Smith finalized Peace's training.

On August 30, 2013, Plaintiff received oral counseling for numerous verbal complaints regarding how she treated prisoners and her co-workers, including Peace. Plaintiff was also informed that Peace was contemplating leaving his job rather than work with Plaintiff. Smith memorialized this conversation into a report she forwarded to Ward.

On February 15, 2014, Plaintiff sent a memorandum to Smith, entitled "Officer Safety Concern" that complained that Peace's "actions were unwarranted and led to the lack of officer safety" regarding his treatment of certain detainees or prisoners (Dkt. #35 at p. 4). Prior to this memorandum, Plaintiff had not filed a written complaint about Peace or anyone else.

On February 24, 2014, Smith wrote a report to Ward regarding Plaintiff's Officer Safety Concern memorandum and the relevant video footage. Smith's report indicated that after investigating and reviewing the video footage, there was no officer safety concern regarding Peace's conduct. However, Smith found there were officer safety concerns with regard to Plaintiff's conduct. Specifically, Plaintiff was recorded leaving prisoners unattended, using derogatory comments in reference to Smith, and constantly complaining to her fellow officers.

On March 7, 2014, Smith issued a written reprimand to Plaintiff for her improper conduct, citing Plaintiff's mishandling of the care and custody of the prisoners, Plaintiff's harassing conduct toward Peace, and Plaintiff's insubordinate or derogatory comments toward

Smith.  Smith also found that Plaintiff did not state a basis to warrant filing the Officer Safety Concern complaint.

On March 27, 2014, Plaintiff meet with Hector Quiroga ("Quiroga"), a human resources analyst for the City, to file a complaint regarding workplace harassment, discrimination, and the issuance of the written reprimand.  Quiroga communicated Plaintiff's complaints to Safranek on April 1, 2014.

On April 3, 2014, Plaintiff appealed the reprimand.  The same day, Smith denied her appeal and Plaintiff appealed the reprimand to Ward.  On April 9, 2014, Ward, after reviewing the video footage, denied Plaintiff's appeal of the reprimand.  Plaintiff appealed the denial to Stevens the same day.

On April 14, 2014, Smith withdrew the portions of the reprimand concerning Plaintiff's harassing conduct toward Peace.  On April 24, 2014, Stevens upheld the modified reprimand. Plaintiff appealed the modified reprimand to Bruce.  On May 28, 2014, Bruce upheld the modified reprimand as to Plaintiff's handling of prisoners.

On April 9, 2014, Defendant Smith placed Plaintiff on a Discipline and Performance Improvement Plan ("PIP").  During her tenure with the City, Smith had never issued a PIP before Plaintiff.  No other detention officers were on PIPs at this time.  Upon receiving the PIP, Plaintiff filed an internal complaint of discrimination with the City and a formal charge with the Equal Employment Opportunity Commission ("EEOC").  On September 16, 2014, Plaintiff received a right to sue letter for conduct that occurred on or before April 9, 2014.

On April 20, 2014, Plaintiff received her first negative performance evaluation from Smith, indicating Plaintiff needed improvement in four areas: (1) interpersonal skills, (2) dependability, (3) work practices, and (4) pride in profession.

On April 23, 2014, Plaintiff appealed the PIP to Smith, asserting that it was improper because it was not issued in conjunction with a written evaluation, and argued that the PIP was retaliatory because it was issued one month after she had appealed the reprimand. Smith denied the appeal. On May 2, 2014, Plaintiff appealed the PIP to Defendant Ward. On May 7, 2014, Ward upheld the PIP. On May 14, 2014, Plaintiff appealed the PIP to Stevens. Stevens denied the appeal and on May 16, 2014, and Plaintiff appealed the denial to Bruce. On May 28, 2014, Bruce denied Plaintiff's appeal of the PIP for reasons stated by Stevens. Plaintiff was removed from the PIP on June 12, 2014.

In July 2014, Peace was transferred back to Plaintiff's shift. On August 1, 2014, Plaintiff had a telephone call with Ward, in which Plaintiff complained about Peace and his recent reassignment to Plaintiff's shift. On August 2, 2014, Plaintiff felt physically ill at work and requested EMS services to take her to the hospital.

On August 4, 2014, a human resources employee for the City called Plaintiff to check on her status after her emergency room visit. Plaintiff complained that she had been placed in a hostile work environment with a co-worker. The next day, a meeting was arranged with Plaintiff, Safranek, Smith, and Ward in the offices of the City's Human Resources Department. The purpose of this meeting was to discuss and investigate Plaintiff's complaints about Peace and his reassignment to Plaintiff's shift. Plaintiff alleges that the meeting was also intended to complain about Smith and Ward's alleged discriminatory and retaliatory conduct toward Plaintiff.

On August 5, 2014, Plaintiff arrived to the meeting early and initially only met with Safranek. Shortly after the meeting began, Smith and Ward joined the meeting. During this meeting, Plaintiff made the following complaints regarding Peace: (1) an incident on July 31,

2014, in which Plaintiff and Peace disagreed regarding the transportation of an inmate, (2) an incident in which Peace, despite Plaintiff's suggestion to the contrary, refused to violate procedure to allow a detainee or prisoner to use a temporary debit card, (3) an incident in which Peace took a phone call from a movie scout, seeking to film in the jail, and (4) Plaintiff generally complained that Peace would ask male detainees or prisoners if they are pregnant.

After being informed that her alleged discrimination examples did not amount to actionable discrimination, Plaintiff attempted to leave the meeting. Ward ordered her to stay in the meeting and informed Plaintiff that leaving would be considered insubordination. Safranek also advised Plaintiff that leaving would be considered job abandonment. Plaintiff left the meeting. That same day, Ward sent Plaintiff a memorandum indicating that he was recommending the termination of her employment as a result her conduct during that meeting.

On August 6, 2014, Bruce placed Plaintiff on administrative leave, pending the investigation regarding her insubordination. On August 11, 2014, Bruce terminated Plaintiff's employment with the City. Plaintiff appealed her termination to Purefoy with representation by counsel. Based on Purefoy's investigation and an appeal hearing on October 9, 2014, the appeal was denied on October 30, 2014.

On January 22, 2015, Plaintiff filed an EEOC complaint for the present claims. A few weeks later, the EEOC sent Plaintiff a letter enclosing a copy of the charge to be filed and requested additional information to assist the EEOC with its investigation. Plaintiff responded to the EEOC's questions and submitted the charge for filing on February 26, 2015. The charge was also cross-filed with the Texas Workforce Commission ("TWC"). On March 30, 2016, the EEOC issued a right to sue letter. On June 16, 2016, the TWC issued its notice of right to file a civil action.

On June 22, 2016, Plaintiff sued Defendants in state court alleging race and gender discrimination, harassment, hostile work environment, and retaliation in violation of state and federal law. On August 3, 2016, Defendants removed this action based upon federal question jurisdiction (Dkt. #1). On September 6, 2016, Plaintiff filed an amended complaint (Dkt. #11).

On July 27, 2017, Defendants filed a motion for summary judgment (Dkt. #35). On August 4, 2017, Plaintiff filed a response (Dkt. #38). On August 11, 2017, Defendants filed a reply (Dkt. #39). On August 18, 2017, Plaintiff filed a sur-reply (Dkt. #40).

## LEGAL STANDARD

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits "[show] that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The trial court must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment. *Casey Enters., Inc. v. Am. Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981) (citations omitted). The substantive law identifies which facts are material. *Anderson*, 477 U.S. at 248.

The party moving for summary judgment has the burden to show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Id.* at 247. If the movant bears the burden of proof on a claim or defense on which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure *all* of the

essential elements of the claim or defense." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).

Where the nonmovant bears the burden of proof, the movant may discharge its burden by showing that there is an absence of evidence to support the nonmovant's case. *Celotex*, 477 U.S. at 325; *Byers v. Dall. Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000). Once the movant has carried its burden, the nonmovant must "respond to the motion for summary judgment by setting forth particular facts indicating there is a genuine issue for trial." *Byers*, 209 F.3d at 424 (citing *Anderson*, 477 U.S. at 248–49). The nonmovant must adduce affirmative evidence. *Anderson*, 477 U.S. at 257. No "mere denial of material facts nor . . . unsworn allegations [nor] arguments and assertions in briefs or legal memoranda" will suffice to carry this burden. *Moayedi v. Compaq Comput. Corp.*, 98 Fed.Appx. 335, 338 (5th Cir. 2004). Rather, the Court requires "significant probative evidence" from the nonmovant in order to dismiss a request for summary judgment supported appropriately by the movant. *United States v. Lawrence*, 276 F.3d 193, 197 (5th Cir. 2001). The Court must consider all of the evidence, but must refrain from making any credibility determinations or weighing the evidence. *See Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

## ANALYSIS

### I. Claims Arising Before April 9, 2014

Defendants reiterate that Plaintiff's claims prior to April 9, 2014, are time-barred and, therefore, no purported adverse actions prior to this period may serve as a basis for an independent claim (Dkt. #35 at p. 16). Plaintiff affirmatively pleaded that she is not seeking redress for any conduct except for that which occurred after April 9, 2014 (Dkt. #11 at ¶ 16 n.2). Thus, Plaintiff cannot assert claims of discrimination and retaliation *based on* incidents

occurring before April 9, 2014. However, this does not prevent either Party from relying on such incidents as evidence in support of timely race or gender discrimination and/or retaliation claims. *See National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 114-115 (2002) (holding that, even where a time-barred adverse employment action cannot itself form the basis of a discrimination or retaliation claim, the same action may serve as evidence of an employer's discriminatory or retaliatory motive). This evidence may be used to demonstrate the discriminatory animus for a prima facie discrimination or retaliation claim, or successful pretext argument. *See United Air Lines v. Evans*, 431 U.S. 553, 558 (1977); *Lopez v. Kempthorne*, 684 F. Supp. 2d 827, 852 (S.D. Tex. 2010) ("[A] Court may consider time-barred acts occurring outside the limitations period insofar as they are relevant to the Defendant's motivation").

Therefore, although Plaintiff cannot assert independent claims of race or gender discrimination and/or retaliation based upon any adverse employment actions that occurred before April 9, 2014, she may rely upon evidence of adverse employment actions prior to April 9, 2014, to the extent such evidence demonstrates Defendant's alleged discriminatory animus or retaliatory motive.[1]

Aside from Plaintiff's termination, only some of Plaintiff's claims fall within the timely filing period, namely that (1) Defendants retaliated against Plaintiff for filing a complaint with human resources and/or appealing the written reprimand by placing her on the PIP and issuing a negative performance review, (2) Defendants retaliated against Plaintiff by re-assigning Peace to her shift, (3) Defendants discriminated against Plaintiff based on race and/or gender by issuing a PIP and poor performance review, and (4) Defendants created a hostile work

---

[1] The Court expresses no opinion as to the ultimate admissibility of such evidence at trial.

environment because they knew of Peace's alleged improper conduct and failed to take remedial action.

## II. Claims Against the City of Frisco (§ 1983, Title VII and Texas Labor Code[2])

### *Title VII Claims*

Under Title VII, Plaintiff must prove that the employer subjected her to an "adverse employment action." *Thompson v. City of Waco*, 764 F.3d 500, 503 (5th Cir. 2014). The Fifth Circuit has held that for Title VII discrimination claims, "adverse employment actions consist of 'ultimate employment decisions' such as hiring, firing, demoting, promoting, granting leave, and compensating." *Id.* at 503. In the retaliation context, the United States Supreme Court has focused on "materially adverse actions[,]" which encompass a broader range of employment decisions and, as such, are "not limited to discriminatory actions that affect the terms and conditions of employment," but those that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64-68 (2006).

Regarding Plaintiff's discrimination claims, "neither an employer's collection and use of documented disciplinary actions against an employee (even for use in the decision to terminate) nor a supervisor's decision to report alleged misbehavior constitute an adverse employment action because their effect, if any, on an ultimate employment decision is tangential." *Daniels v. Texas Dep't of Transportation*, No. 4:15-CV-00702-CAN, 2017 WL 67926, at *4 (E.D. Tex. Jan. 6, 2017). *See, e.g.*, *King v. Louisiana*, 294 Fed.Appx. 77, 84-85

---

[2] The purpose of the Texas Commission on Human Rights Act ("TCHRA") is to coordinate state law with federal law in the area of employment discrimination. Tex. Labor Code Ann. §§ 21.001–21.556; *Vielma*, 218 F.3d at 462. *See Machinchick v. PB Power, Inc.*, 398 F.3d 345, 356 (5th Cir. 2005) (observing there was "no meaningful distinction" between analysis under Title VII and the TCHRA). Therefore, to the extent that the undersigned recommends summary judgment on Plaintiff's Title VII claims, the undersigned also recommends summary judgment on Plaintiff's state law claims.

(5th Cir. 2008) (per curiam) ("Our discrimination jurisprudence has held that poor performance evaluations, unjust criticism, and being placed on probation do not constitute 'ultimate employment decisions.'") (citing *McCoy v. City of Shreveport*, 492 F.3d 551, 556–57 (5th Cir. 2007)); *Roberson v. Game Stop/Babbage's*, 152 Fed.Appx. 356, 360 (5th Cir. 2005) (per curiam).

Accordingly, only Plaintiff's termination may serve as an adverse employment action for her discrimination claim. However, Plaintiff's retaliation claims may relate to the PIP, the negative performance evaluation, Peace's reassignment to her shift, and her termination.

## A. Race and Gender Discrimination

Plaintiff alleges that the Defendants unlawfully discriminated against her on the basis of her race and gender, in violation of Title VII. Title VII of the Civil Rights Act of 1964 prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).

Since the record contains no direct evidence of race discrimination,[3] the Court applies the three-step burden-shifting framework utilized by the Supreme Court in *McDonnell Douglas Corporation v. Green,* to analyze Plaintiff's claims of race discrimination in employment. 411 U.S. 792, 93 (1973); *see St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506, (1993); *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252–53 (1981).

In order to establish a prima facie claim of racial discrimination under Title VII, a plaintiff must show she "(1) is a member of a protected group; (2) was qualified for the position

---

[3] "Direct evidence" in the employment discrimination context is "evidence which, if believed, proves the fact [of discriminatory animus] without inference or presumption." *Mooney v. Aramco Services Co.,* 54 F.3d 1207, 1217 (5th Cir. 1995) (citing *Brown v. East Mississippi Electric Power Association,* 989 F.2d 858, 861 (5th Cir. 1993)).

at issue; (3) was discharged or suffered some adverse employment action by the employer; and (4) . . . was treated less favorably than other similarly situated employees outside the protected group." *McCoy v. City of Shreveport,* 492 F.3d 551, 556 (5th Cir. 2007). If a plaintiff makes a prima facie showing of discrimination, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action. *Id.* at 557. The plaintiff then "bears the ultimate burden of proving that the employer's proffered reason . . . is a pretext . . . ." *Id.* When the analysis has proceeded to this third step, the plaintiff—to avoid summary judgment—must produce evidence from which a reasonable factfinder could find "that the employer's reasons were not the true reason for the employment decision *and* that unlawful discrimination was." *Bodenheimer v. PPG Industries, Inc.,* 5 F.3d 955, 957 (5th Cir. 1993) (emphasis in original).

In the present case, Defendants argue that Plaintiff's race and gender discrimination claims cannot survive summary judgment because Plaintiff can point to no comparator—a similarly situated, non-white male employee who was not terminated under nearly identical circumstances—in support of her discrimination claim (Dkt. #35 at p. 21–22). "Similarly situated employees are employees who are treated more favorably in nearly identical circumstances; the Fifth Circuit defines similarly situated narrowly." *Lopez v. Kempthorne*, 684 F. Supp. 2d 827, 856-57 (S.D. Tex. 2010) (internal citations and quotations omitted). The Fifth Circuit has described "similarly situated" employees as follows:

> The employment actions being compared will be deemed to have been taken under nearly identical circumstances when the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories. And, critically, the plaintiff's conduct that drew the adverse employment decision must have been "nearly identical" to that of the proffered comparator who allegedly drew dissimilar employment decisions. If the "difference between the plaintiff's conduct and that of those alleged to be similarly situated accounts for the difference in treatment received from the

employer," the employees are not similarly situated for the purposes of employment discrimination analysis.

*Lee v. Kansas City Southern Ry. Co.*, 574 F.3d 253, 259-60 (5th Cir. 2009); *see also Perez v. Texas Dep't of Criminal Justice, Inst'l Div.*, 395 F.3d 206, 213 (5th Cir. 2004) ("We . . . have explained consistently that for employees to be similarly situated those employees' circumstances, including their misconduct, must have been 'nearly identical.'"). Thus, where a plaintiff alleges disparate discipline, she is required to prove the employer treated similarly situated employees charged with nearly identical misconduct differently. *Sagaral v. Wal-Mart Stores Texas LP*, 516 F. Supp. 2d 782, 799–800 (S.D. Tex. 2007). "[T]he conduct at issue is not nearly identical when the difference between the plaintiff's conduct and that of those alleged to be similarly situated accounts for the difference in treatment received from the employer." *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 221 (5th Cir. 2001) (citation omitted); *see also Hockman v. Westward Communications, LLC*, 282 F.Supp.2d 512, 527–28 (E.D. Tex. 2003).

Plaintiff contends that Peace was a proper comparator, that was "similarly situated" to her, and was treated more favorably in nearly identical circumstances. The two detention officers had the same job and responsibilities. Plaintiff and Peace both reported to Smith as their immediate supervisor. Defendants do not dispute these facts. However, Defendants contend that Plaintiff was not similarly situated to Peace because of different disciplinary records.

Defendants contend that there is no evidence that Peace had multiple parties complaining about working with him, Peace was not disciplined for allowing prisoners to wander freely in the book-in area or ignoring their medical needs, Peace did not make derogatory comments about his supervisor, and Peace didn't violate a direct command by a supervisor. At the time the City terminated Plaintiff's employment, Plaintiff's disciplinary

history as documented in the record included the following: (1) oral reprimand, (2) written reprimand, (3) PIP, (4) negative performance evaluation, and (5) insubordination for leaving meeting.

Plaintiff asserts that Peace is a proper comparator because Peace was not given a written reprimand for violating the policies mentioned in her Officer Safety Concern memorandum, Peace was not reprimanded for making complaints to Smith regarding Plaintiff's conduct, and Peace was not reprimanded for violating the department's anti-harassment policy after Plaintiff complained about him yelling at her (Dkt. #38 at p. 11, 19). Although Plaintiff may offer evidence of disciplinary actions prior to April 9, 2014, to the extent it demonstrates Defendants' discriminatory animus in the City's decision to terminate her employment, she cannot establish her disciplinary history is distinguishable on that basis. *See, e.g.*, *Daniels* 2017 WL 67926, at *6.

Plaintiff fails to provide any evidence of Peace's disciplinary record. In fact, Plaintiff confirms that Peace's record had substantially less disciplinary marks (Dkt. #38 at p. 19–20). Furthermore, Plaintiff cannot show "the conduct that drew the adverse employment decision [was] 'nearly identical' to that of the proffered comparator who allegedly drew dissimilar employment decisions." *Lee,* 574 F.3d at 260. Plaintiff admits that "no other employee has walked out of such a meeting." (Dkt. #38 at p. 20). Plaintiff confirms that the meeting on August 5, 2014, was a "situation in which there are no other comparators." (Dkt. #38 at p. 20). The insubordination for leaving the meeting formed the foundation of the City's decision to terminate Plaintiff's employment, according to Bruce's letter terminating Plaintiff (Dkt. #35, Exhibit 6 at p. 316–317). Accordingly, the Court finds that Peace is not a valid comparator.

Even if it is assumed that Plaintiff has presented a prima facie case, her claims would fail for want of evidence from which a reasonable jury could conclude that the legitimate reasons offered by the Defendants were pretexts for race and gender discrimination. Because she will bear the burden of proof on these elements of her claim at trial, this lack of evidence is fatal. *See Celotex,* 477 U.S. at 322–23. Accordingly, the Defendants' motion for summary judgment on Plaintiff's race and gender discrimination claims is granted.

## B. Retaliation

To establish a prima facie case of retaliation, Plaintiff must show as follows: (1) she engaged in an activity protected by the applicable statutes; (2) she was subject to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action. *Davis v. Dallas Area Rapid Transit,* 383 F.3d 309, 319 (5th Cir. 2004); *Perez v. Region 20 Educ. Svc. Ctr.,* 307 F.3d 318, 325 (5th Cir. 2002). The employment action must be "materially adverse," one that would "dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68 (2006). Once this prima facie burden is met, retaliation claims utilize the same *McDonnell-Douglas* burden-shifting approach.

### i. PIP and Negative Performance Evaluation

Defendants assert that Plaintiff cannot establish the second element of her prima facie case that she was subject to an adverse employment action with regard to the negative performance review and PIP (Dkt. #35 at p. 18–19).

The Fifth Circuit has found a PIP to be a materially adverse action on which a plaintiff may base his retaliation claim. *Ray v. Tandem Computs., Inc.*, 63 F.3d 429, 435 (5th Cir. 1995) (holding that PIP and termination of employment were adverse employment actions); *see also*

*Pollak v. Lew*, No. H-11-2550, 2013 WL 1194848, at \*9 (S.D. Tex. Mar. 22, 2013), *aff'd*, 542 Fed.Appx. 304 (5th Cir. 2013) (finding placement on a PIP could dissuade a reasonable employee from engaging in protected activity). "Written warnings and unfavorable performance reviews are not adverse employment actions where colorable grounds exist for disciplinary action or where the employee continues to engage in protected activity." *Jackson v. Honeywell Int'l, Inc.*, 601 F. App'x 280, 286 (5th Cir. 2015) (citing *Burlington*, 548 U.S. at 68). The Court must objectively evaluate the negative performance reviews and PIP.

Plaintiff presented evidence that in her performance evaluation from April 2013, Smith wrote "none needed" under "Areas of Improvement" for categories such as relations with the public and co-workers, dependability, cooperation judgment, initiative, and time utilization (Dkt. #38 at p. 5). Plaintiff's positive performance review she received approximately a year before the incidents giving rise to this suit creates a fact issue regarding whether colorable grounds exist. Thus, Plaintiff's PIP and negative performance review can support a retaliation claim. *See Al-habash v. Raytheon Co.*, No. 4:15-CV-450, 2016 WL 6155601, at \*9 (E.D. Tex. Oct. 24, 2016).

Plaintiff must also show a causal connection between the materially adverse action and the protected activity to survive summary judgment. *See Davis v. Fort Bend Cty.*, 765 F.3d 480, 491 (5th Cir. 2014). Temporal proximity between an employer's knowledge of protected activity and an adverse employment action can serve, in some instances, as indirect evidence of a causal link. *Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 808 (5th Cir. 2007).

Plaintiff asserts that when she complained about harassment and discrimination to the Human Resources Department and appealed the written reprimand, she suffered further retaliation by being placed on the PIP and later received her first negative performance review.

Plaintiff meet with Quiroga on March 27, 2014, to inform him of her complaints. Quiroga communicated Plaintiff's complaints to Safranek on April 1, 2014. On April 3, 2014, Plaintiff appealed the reprimand. The same day, Smith denied her appeal and Plaintiff appealed the reprimand to Ward. On April 9, 2014, Ward denied Plaintiff's appeal of the written reprimand. That same day, Smith placed Plaintiff on a PIP. A few weeks later, Plaintiff received her first ever negative performance evaluation from Smith dated April 30, 2014.

The evidence shows that Smith placed Plaintiff on a PIP less than two weeks after she complained to human resources and less than a week after Plaintiff appealed her written reprimand. During her tenure with the City, Smith had never used a PIP before issuing one to Plaintiff. Plaintiff has additionally provided evidence that Smith was aware of Plaintiff's complaint to the Human Resources Department. Viewing Plaintiff's evidence in the light most favorable to her case, the Court finds that there is a genuine fact issue present with regard to a prima facie case for retaliation.

Defendants assert that there is a legitimate non-retaliatory reason for issuing Plaintiff the PIP and negative performance review. Defendants claim the PIP and negative performance review were based on Plaintiff's continued work-related issues as originally found in the written remand and also reflected in the oral counseling. Defendants claim the PIP was somewhat delayed because Smith had never issued a PIP before, because Smith needed to consult with Ward and human resources regarding how to properly complete the document, and because of vacation schedules. Defendants' evidence is sufficient to meet their burden of producing

evidence of legitimate non-retaliatory reasons for issuing the PIP and negative performance review.

Given the fact that Smith had never issued a PIP before and the timing between Plaintiff's complaint to human resources and the issuance of the PIP and negative performance review, a reasonable jury could find that both were applied against Plaintiff in this case as pretext. Accordingly, the Court finds that Plaintiff meets her burden of establishing a Title VII retaliation claim regarding the issuance of the PIP and performance review, and her retaliation claim should proceed to trial.

### ii.     Peace's Transfer to Plaintiff's Shift

Plaintiff alleges that Peace was transferred to her shift to create a hostile work environment in retaliation for Plaintiff's appeal of the written reprimand and PIP, and filing complaints with the Human Resources Department and EEOC. Defendants contend that this does not constitute an adverse employment action because it did not alter Plaintiff's job or duties.

First, the Fifth Circuit has not recognized a retaliatory hostile work environment cause of action. *See Heath v. Bd. of Supervisors for S. Univ. & Agric. & Mech. Coll.*, 850 F.3d 731, 742 n.5 (5th Cir. 2017); *Bryan v. Chertoff*, 217 Fed.Appx. 289, 293 (5th Cir. 2007).

Second, an adverse employment action is one that "a reasonable employee would have found . . . materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Higbie v. Kerry*, 605 F. App'x 304, 308 (5th Cir. 2015) (quoting *Burlington,* 548 U.S. at 68). Peace's transfer is not the sort of employment action that would dissuade a reasonable employee from reporting discrimination. Plaintiff also fails to demonstrate any causal link between the allegedly

retaliatory action and her participation in a protected activity, as she must for her retaliation claim to survive summary judgment. *See Harvill v. Westward Commc'ns, LLC,* 433 F.3d 428, 439 (5th Cir. 2005). Thus, Plaintiff cannot maintain a retaliation claim based on Peace's reassignment to her shift.

### iii. Termination

Defendants challenge Plaintiff's ability to demonstrate a causal connection between her engaging in a protected activity and Defendants' decision to terminate her employment. The Parties dispute who requested the meeting with Safranek, the Director of Human Resources, but Plaintiff presented evidence that she requested the meeting to file a complaint against Peace, Smith, and Ward. Plaintiff scheduled her meeting with Safranek on August 5, 2014. Plaintiff claims that she initially began the meeting by trying to file her complaints against Peace for racial and sexual harassment and discrimination, and was subsequently going to file complaints against Smith and Ward for supporting a hostile work environment and retaliation.

Smith and Ward joined the meeting shortly after the meeting began and upon their arrival, Plaintiff tried to leave the meeting. Safranek informed Plaintiff that if she left the meeting it would be considered an abandonment of her job. Ward gave Plaintiff a direct order to sit down, indicating that failure to do so would be considered insubordination. Plaintiff continued to walk out the door, and left the meeting. That same day, Ward sent Plaintiff a memorandum indicating that he was recommending termination of Plaintiff's employment as a result her insubordination.

On August 6, 2014, Bruce placed Plaintiff on administrative leave, pending the investigation regarding her insubordination. On August 11, 2014, Bruce terminated Plaintiff's

employment with the City for insubordination. Plaintiff appealed her termination to Purefoy, and after an investigation and appeal hearing, this appeal was denied on October 30, 2014.

The summary judgment evidence establishes that Bruce, as Chief of Police for the City, had the final authority to hire and fire employees. Smith and Ward, as Plaintiff's supervisors with regard to the relevant chain of command, had the authority to make recommendations concerning the employment status of their subordinate employees. In this case, Ward recommended that Plaintiff be terminated. Bruce made the final decision to terminate Plaintiff. If Bruce based his decision on his own independent investigation, the causal link between Smith and Ward's allegedly retaliatory intent and Plaintiff's termination would be broken. On the other hand, if Bruce did not conduct his own independent investigation, and instead merely rubber stamped the recommendations of Smith and Ward, the causal link between Plaintiff's protected activities and subsequent termination remains intact. The degree to which Bruce's decisions were based on his own independent investigation is a question of fact. Accordingly, the Court finds that Plaintiff has presented sufficient evidence to establish a causal link between her protected activity and her termination.

Defendants assert that there are legitimate, nondiscriminatory reasons for terminating Plaintiff—her disciplinary history and her alleged insubordination during the August 5, 2014 meeting. Because Defendants have articulated a legitimate, nondiscriminatory reason for the termination, it is Plaintiff's burden to present evidence that Defendants' reasons are pretext for the retaliation and that, but for this protected activity, Plaintiff would not have been terminated. *Pineda v. United Parcel Service, Inc.*, 360 F.3d 483, 487 (5th Cir. 2004).

Plaintiff has produced sufficient evidence that Defendants' proffered reason for her termination was pretext. Plaintiff asserts that she was terminated for engaging in protected

activity—complaining about the very supervisors who claimed Plaintiff was insubordinate. Plaintiff has also provided evidence that her immediate supervisor would not recommend termination for an act of insubordination (Dkt. #38 at p. 23). Plaintiff has offered sufficient summary judgment evidence to establish "but for" causation. Therefore, summary judgment should be denied as to Plaintiff's claim for retaliation regarding her termination and should proceed to trial.

### C. Hostile Work Environment

A prima facie case of hostile work environment requires the plaintiff to prove that the employee was subject to unwelcome harassment and that the employer should have known of the harassment and failed to take prompt remedial action. *Felton v. Polles,* 315 F.3d 470, 484 (5th Cir. 2002). A "discriminatorily hostile or abusive" work environment, if "sufficiently severe or pervasive," may "alter the conditions of the victim's employment" and, thus, violate Title VII. *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993) (quoting *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 67 (1986)). Defendants argue that Plaintiff's factual allegations, even if true, do not rise to such a level.

The Court determines whether a work environment violates the statute by looking at all the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23. "To be actionable, the challenged conduct must be both objectively offensive, meaning that a reasonable person would find it hostile and abusive, and subjectively offensive, meaning that the victim perceived it to be so." *Harvill,* 433 F.3d at 434 (quoting *Shepherd v. Comptroller of Pub. Accounts of Tex.,* 168 F.3d 871, 874 (5th Cir. 1999)).

Plaintiff offers only cursory assertions that Peace's actions resulted in a hostile work environment. For example, Plaintiff complains that Peace "constantly compared her to a male former supervisor while refusing to follow instructions, and he treated men respectfully even though he was "very condescending" toward Plaintiff." (Dkt. #38 at p. 5). Plaintiff also complains that Peace made comments regarding the George Zimmerman trial and about his brother's ex-girlfriend not letting his brother see his brother's child, because "females get whatever they want." (Dkt. #38 at p. 6).

As to the frequency of the conduct, Peace's offensive remarks made directly to Plaintiff appear to be isolated incidents, which, to violate Title VII, must be "extremely serious." *Faragher v. City of Boca Raton,* 524 U.S. 775, 788, (1998); *see also Lauderdale v. Tex. Dep't of Criminal Justice,* 512 F.3d 157, 163 (5th Cir. 2007) ("[T]he required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct.") (quoting *Ellison v. Brady,* 924 F.2d 872, 878 (9th Cir. 1991)).

These comments are trivial and cannot support a hostile work environment claim. *See Faragher,* 524 U.S. at 788 (noting that Title VII does not protect against the "ordinary tribulations of the workplace"); *see also Burlington Northern,* 126 S.Ct. at 2407 ("An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience."). Accordingly, Plaintiff has not established a prima facie case of hostile work environment, and summary judgment is proper.

### § 1981 and § 1983 Retaliation Claim

Because Plaintiff failed to present sufficient summary judgment evidence with regard to her Title VII discrimination and hostile work environment claims, the Court will only address

Plaintiff's Section 1983 claim for alleged violations of the Equal Protection Clause of the Fourteenth Amendment for retaliation. Section 1983 provides a cause of action for individuals who have been "depriv[ed] of any rights, privileges, or immunities secured by the Constitution and laws" of the United States by a person or entity acting under color of state law. 42 U.S.C. § 1983. Section 1983 does not grant substantive rights, but provides a vehicle for a plaintiff to vindicate rights protected by the United States Constitution and other federal laws. *See Albright v. Oliver*, 510 U.S. 266, 271 (1994).

"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a) (2006). Congress defined the phrase "make and enforce contracts" to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id.* § 1981(b). Section 1981 does not explicitly provide a remedy for violating these rights. However, the Supreme Court has read § 1981 "to reach private action and have implied a damages remedy to effectuate the declaration of rights contained in that provision." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 731 (1989). Accordingly, private actors who violate these rights may be sued directly under § 1981. *Id.*

As to state actors, § 1983 can provide the remedy. 42 U.S.C. § 1983 ("Every person who, under color of [state law], subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights . . .secured by the . . . laws, shall be liable to the party injured in an action at law."). In fact, the Supreme Court in *Jett* held "the express cause of action for damages created by § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units." *Jett*, 491 U.S. at 733. While Congress amended § 1981

after *Jett*,[4] the Fifth Circuit has held that § 1983 continues to provide the exclusive federal remedy against state actors for violations of § 1981. *Oden v. Oktibbeha County, Miss.*, 246 F.3d 458, 463 (5th Cir. 2001). Therefore, in the Fifth Circuit, state actors who violate § 1981 rights must be sued through § 1983.

"The first step in any such claim is to identify the specific constitutional right allegedly infringed." *Albright v. Oliver*, 510 U.S. 266, 271 (1994). The right to be free from retaliation for exercising rights protected by § 1981 was clearly established by the Civil Rights Act of 1991. *Foley v. Univ. of Houston Sys.*, 355 F.3d 333, 338–39 (5th Cir. 2003). The Fifth Circuit has held that § 1981 afforded a cause of action to an employee who suffered retaliation in response to his filing of an EEOC charge or lawsuit alleging racial discrimination. *Goff v. Cont'l Oil Co.*, 678 F.2d 593, 597–99 (5th Cir. 1982).

To establish § 1983 liability against a municipality, a plaintiff must show that the protected right was violated by the execution of the municipality's policy or custom. The theory of respondeat superior is insufficient to establish a municipality's liablity in § 1983 cases. *Deville v. Marcantel*, 567 F.3d 156, 170 (5th Cir. 2009) (citing *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691 (1978)). Liability may be imposed "only where [the government entity] *itself* causes the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (citing *Monell*, 436 U.S. at 694-95) (emphasis in original). Thus, in order to hold the City liable under § 1983, Plaintiff must establish that the "execution of [the City's] policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Deville,* 567 F.3d at 170. A governmental entity may also

---

[4] Congress added the following provision to the statute: "The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law." 42 U.S.C. § 1981(c).

be sued "for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Monell*, 436 U.S. at 690-91. An "official policy" is:

1. A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or

2. A persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority.

*Bennett v. City of Slidell*, 735 F.2d 861, 862 (5th Cir. 1984). "[W]hen proceeding under § 1983, 'each and any policy which allegedly caused constitutional violations must be specifically identified by a plaintiff.'" *Akins v. Liberty County*, No. 1:10-cv-328, 2014 WL 105839, at *9 (E.D. Tex. Jan. 9, 2014) (citing *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)). Therefore, for § 1983 liability to attach, a plaintiff must demonstrate three elements: "a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Id.* (citing, *inter alia*, *Cox v. City of Dallas*, 430 F.3d 734, 748 (5th Cir. 2005)). Therefore, to prevail under § 1983, Plaintiff must point to more than isolated unconstitutional actions of an employee; instead, she "must identify a policymaker with final policymaking authority and a policy that is the 'moving force' behind the alleged constitutional violation." *Rivera v. Houston Indep. Sch. Dist.*, 349 F.3d 244, 247 (5th Cir. 2003) (quoting *Piotrowski*, 237 F.3d at 578).

The first type of "policy" is characterized by formal rules and understandings which constitute fixed plans of action to be followed under similar circumstances consistently and over time. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986); *accord Gonzalez v.*

*Ysleta Indep. Sch. Dist.*, 996 F.2d 745, 754 (5th Cir. 1993). The second type of "policy" arises from custom, *i.e.*, "conduct that has become a traditional way of carrying out policy and has acquired the force of law." *Bennett v. City of Slidell*, 728 F.2d 762, 768 (5th Cir. 1984). A third type of "policy" stems from "a final decisionmaker's adoption of a course of action 'tailored to a particular situation and not intended to control decisions in later situations.'" *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 406 (1997) (quoting *Pembaur*, 475 U.S. at 481). "[A] single decision by a policy maker may, under certain circumstances, constitute a policy for which the county may be liable." *Bryan Cty.*, 219 F.3d at 462; *accord Bolton v. City of Dallas*, 541 F.3d 545, 548 (5th Cir. 2008), *cert. denied*, 556 U.S. 1152 (2009); *Gelin v. Hous. Auth. of New Orleans*, 456 F.3d 525, 527 (5th Cir. 2006). Furthermore, the Fifth Circuit has held that when a final policymaker makes a decision, and that decision is within the sphere of the policymaker's final authority, "the existence of a well-established, officially-adopted policy will not insulate the municipality from liability." *Bennett v. Pippin*, 74 F.3d 578, 586 (5th Cir.), *cert. denied*, 519 U.S. 817 (1996) (quoting *Gonzalez*, 996 F.2d at 754).

Plaintiff does not specifically identify a county-wide policy or custom that led to the purported denial of her constitutional rights. Plaintiff readily admits that the City "has multiple policies related to discrimination and retaliation" designed to protect her constitutional rights (Dkt. #38 at p. 25). The "established police department and City policies not only allowed Plaintiff to complain about harassment, discrimination, and retaliation without reprisal, they required her to file such complaints." (Dkt. #38 at p. 17). Plaintiff merely alleges that those policies were violated by the individual Defendants. *See Walker v. City of Dallas, Tex.*, 336 Fed. App'x 459, 461 (5th Cir. 2009) (holding that summary judgment for the City of Dallas was warranted where the plaintiff had failed to point to any policy or custom with respect to high-

speed chases that caused a deprivation of his rights, especially where the only policy he identified was a policy forbidding police chases). General allegations that a policy was not followed or that the policy was inadequate is not sufficient to support a claim for municipal liability. *See Goodman v. Harris County*, 571 F.3d 388, 396–97 (5th Cir. 2009). Further, Plaintiff has no evidence to support her assertions that a policy was not followed or was inadequate.

Furthermore, the existence of a governmental policy or custom cannot be inferred from isolated instances of misconduct by subordinate, non-policymaking employees without additional evidence. *Piotrowski*, 237 F.3d at 581. An exception to this rule, however, is that a "single decision" by a policymaker may be found to constitute an official policy, but only under the "extremely narrow" circumstance that the decisionmaker was also a "final policymaker." *Bolton,* 541 F.3d at 548 (citing *Woodard v. Andrus,* 419 F.3d 348, 352 (5th Cir. 2005).

A final policymaker "is someone who has 'the responsibility for making law or setting policy in any given area of a local government's business.'" *Id.* (quoting *City of St. Louis v. Praprotnik,* 485 U.S. 112, 125 (1988)). To determine whether an official is a "final policymaker," a court must "'identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue.'" *Bolton,* 541 F.3d at 548 (quoting *McMillian v. Monroe County,* 520 U.S. 781, 784–85 (1997)). Further, a "final policymaker" is not the same as a "final decisionmaker." *Id.* at 548–49. In *Pembaur,* the Supreme Court illustrated that distinction in the following manner:

> [F]or example, the County Sheriff may have discretion to hire and fire employees without also being the county official responsible for establishing county employment policy. If this were the case, the Sheriff's decisions respecting employment would not give rise to municipal liability, although similar

decisions with respect to law enforcement practices, over which the Sheriff is the official policymaker, would give rise to municipal liability. Instead, if county employment policy was set by the Board of County Commissioners, only that body's decisions would provide a basis for county liability. This would be true even if the Board left the Sheriff discretion to hire and fire employees and the Sheriff exercised that discretion in an unconstitutional manner; the decision to act unlawfully would not be a decision of the Board. However, if the Board delegated its power to establish final employment policy to the Sheriff, the Sheriff's decisions would represent county policy and could give rise to municipal liability.

475 U.S. at 483 n.12; *see Praprotnik,* 485 U.S. at 129–30; *Bolton,* 541 F.3d at 549 n.3. "The finality of an official's action does not therefore automatically lend it the character of a policy." *Id.* at 550.

In this case, Plaintiff has failed to provide evidence that Bruce's decision to terminate Plaintiff's employment was made by a "final policymaker."  The summary judgment evidence merely establishes that Bruce, as Chief of Police for the City, had the final authority to hire and fire employees, and Purefoy had authority to review Bruce's decisions.  Thus, summary judgment in favor of the City is warranted as to Plaintiff's § 1983 claim.

**III. Claims Against Individual Defendants Smith, Ward, Bruce, Safranek, and Purefoy**

*Title VII*

Plaintiff cannot state a claim against Smith, Ward, Bruce, Safranek, and Purefoy (collectively, "Individual Defendants") in their individual capacities under Title VII, which provides for suit against "employers" only, as defined by the statute.  *Grant v. Lone Star Co.,* 21 F.3d 649, 652 (5th Cir. 1994) ("Only 'employers,' not individuals acting in their official capacity who do not otherwise meet the definition of 'employers,' can be liable under Title VII.").  *See also Harvey v. Blake,* 913 F.3d, 226, 227 (5th Cir. 1990) (concluding that a public official's liability under Title VII is premised on her role as an agent of the city, so any recovery must be against her in her official, not individual, capacity).

### § 1981, § 1983 & Qualified Immunity

Plaintiff claims that Smith, Ward, Bruce, Safranek, and Purefoy retaliated against her by issuing the PIP and negative performance review, and terminating her for engaging in a protected activity, in violation of § 1981. Plaintiff asserts this claim against Defendants in their individual capacities through § 1983. In response, Defendants cite *Oden v. Oktibbeha County, Miss.,* 246 F.3d 458, 463 (5th Cir. 2001), for the proposition that local government officials are not individually liable for decisions affecting government employment contracts.

In *Oden*, the plaintiff sued the county sheriff directly under § 1981 for failing to promote him to chief deputy because of his race. The question before the Fifth Circuit was whether the plaintiff could "assert an independent [i.e., not through § 1983] cause of action under § 1981" against the sheriff in either his official or individual capacity. *Id.* at 462.

The Fifth Circuit first examined whether the plaintiff could sue the sheriff in his *official* capacity directly under § 1981. *Id.* at 462–64. The Fifth Circuit determined, after an examination of the Supreme Court's decision in *Jett* and the legislative history of the 1991 amendment, that § 1983 continues to provide the only remedy for § 1981 violations by state actors. *Id.* (citing *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701 (1989)). The sheriff in his official capacity was a state actor. Therefore, the plaintiff could only bring his § 1981 claim against the sheriff in his official capacity through § 1983. *Id.*

The Fifth Circuit then addressed the question of whether the plaintiff could sue the sheriff in his *individual* capacity directly under § 1981. *Id.* at 464. The defendant in the case did not "dispute that § 1981 provides an implicit cause of action against private actors in private employment discrimination cases." *Id.* (citations omitted). The defendant, instead, argued that he was "not a proper party in [the] suit because he was acting in his official capacity." *Id.* The

Fifth Circuit agreed because the sheriff's decision of whom to promote "was an official decision." *Id.* In other words, only state actors, not private individuals, can make official decisions related to government contracts. Therefore, any resulting § 1981 violation must be remedied through § 1983. *Id.* at 463 ("Section 1983 remains the only provision to expressly create a remedy against persons acting under color of state law."); *see also Felton v. Polles*, 315 F.3d 470, 481 (5th Cir. 2002) (holding state employee's "independent § 1981 claim—*not* brought through § 1983—against [his supervisor] in his individual capacity is contrary to *Jett*" (citing *Jett*, 491 U.S. at 735)).

With this background, the meaning of the following passage cited by Defendants is clear:

> [W]hen a plaintiff asserts a cause of action under § 1981 for discrimination in the terms and conditions of a municipal employment contract, the proper defendant is the government employer in his official capacity. Because [the sheriff's] choice to promote [another deputy] to chief deputy was an official decision, he is not personally liable under § 1981. We therefore dismiss the district court's judgment against [the sheriff] in his individual capacity.

*Oden*, 246 F.3d at 464–65.

The Court interprets this passage as simply reiterating that § 1983 provides the exclusive "remedy against persons acting under color of state law." *Id.* at 463. Since any official decision relating to a municipal employment contract is necessarily "under color of state law," the plaintiff in the case could not sue the sheriff directly under § 1981. *Id.* The Fifth Circuit in *Oden* never questioned whether the plaintiff could have pursued his § 1981 claim through § 1983. *See id.* at 462 ("Plaintiffs may also pursue a § 1983 cause of action against persons acting under color of state law in order to assert their substantive rights under § 1981."). Therefore, the Court holds that local government officials may be sued in their individual capacity for their violations of § 1981, but only through § 1983. *Id.* at 464–65; *Felton*, 315 F.3d

at 481–82; *Willrich v. Ctr. for Health Care Servs.*, No. SA-06-CA-958-XR, 2007 WL 1300470, at *4 (W.D. Tex. May 3, 2007).

Defendants merely state that because Plaintiff's Title VII claims fail, her § 1981 and 1983 claims fail because both claims are analyzed under the same *McDonnell Douglas* burden-shifting analysis. *See Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 319 (5th Cir. 2004). However, Defendants' summary judgment is denied as to Plaintiff's Title VII retaliation claims regarding the issuance of the PIP, negative performance evaluation, and termination. Thus, that conduct may also form the basis of her § 1981 claim.

Defendants further argue that even if Plaintiff can successfully prove her § 1981 claim, they are entitled to qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). It "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* To overcome qualified immunity, Plaintiff must allege facts showing a violation of a statutory or constitutional right that was "clearly established" at the time of the alleged misconduct. *Id.* at 816–21.

### A. Issuance of the PIP and Negative Performance Evaluation

Plaintiff's right to be free from retaliation for exercising rights protected by § 1981 was established by the Civil Rights Act of 1991. *See Foley,* 355 F.3d at 338–39. Safranek further conceded that the right to be free from retaliation is clearly established (Dkt. #38 at p. 25).

Nevertheless, the Defendants are protected by qualified immunity unless objectively reasonable officials in their position would have been aware that the specific actions alleged and shown by summary judgment proof violated the statutory rights conferred by § 1981.

An official's conduct is objectively reasonable unless all reasonable officials in that defendant's circumstances would have known that the conduct violated the Constitution. *Gates v. Tex. Dep't of Protective & Regulatory Servs*., 537 F.3d 404, 419 (5th Cir. 2008). Qualified immunity "gives ample room for mistaken judgments" by protecting "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 343 (1986). If reasonable public officials could differ on the lawfulness of Defendants' actions, Defendants are entitled to qualified immunity. *Pfannstiel*, 918 F.2d at 1178. The issue is an "objective (albeit fact-specific) question whether a reasonable officer could have believed" that he was violating a person's constitutionally protected rights under the circumstances of the complained-of action. *See Anderson v. Creighton*, 483 U.S. 635, 641 (1987).

Smith should have been aware that Plaintiff had the right to be free from a retaliatory PIP and negative performance evaluation for complaining about a hostile work environment. As explained above, Plaintiff has created a genuine fact dispute as to whether Smith's decision to issue the PIP and negative performance review was based on her alleged poor performance or whether it was based on her filing her EEOC complaint. If Smith performed the retaliatory acts, she is not entitled to qualified immunity.

Regarding Ward and Bruce, it is well settled that § 1983 jurisprudence establishes that supervisory officials cannot be held vicariously liable for their subordinate's actions. *See Monell v. Department of Social Services,* 436 U.S. 658, 691–95 (1978); *Thibodeaux v. Arceneaux,* 768 F.2d 737, 739 (5th Cir. 1985) (per curiam). A supervisor may be liable under

§ 1983 and lose qualified immunity if "there exists either (1) his personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Thompkins v. Belt*, 828 F.2d 298, 304 (5th Cir. 1987).[5] "A sheriff not personally involved in the acts that deprived the plaintiff of his constitutional rights is liable under section 1983 if: (1) the sheriff failed to train or supervise the officers involved; (2) there is a causal connection between the alleged failure to supervise or train and the alleged violation of the plaintiff's rights; and (3) the failure to train or supervise constituted deliberate indifference to the plaintiff's constitutional rights." *Thompson v. Upshur Cty., TX*, 245 F.3d 447, 459 (5th Cir. 2001).

Deliberate indifference requires proof that municipal actor "disregarded a known or obvious consequence of his conduct." "Deliberate indifference is an extremely high standard to meet." *Domino v. Tex. Dep't of Crim. Justice*, 239 F.3d 752, 756 (5th Cir. 2001). "Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference." *Doe ex rel. Doe v. Dall. Indep. Sch. Dist.*, 153 F.3d 211, 219 (5th Cir. 1998).

Plaintiff has not presented sufficient evidence to create a genuine fact issue that Ward or Bruce failed to train Smith, or through their own individual actions—denying Plaintiff's appeal of the PIP—caused Plaintiff to be subjected to a deprivation of her constitutional rights. Ward, and Bruce are entitled to summary judgment on the issue of qualified immunity regarding the issuance of the PIP and negative performance review. Smith, however, is not.

---

[5] For the latter "supervisory liability" claim, "the misconduct of the subordinate must be affirmatively linked to the action or inaction of the supervisor." *Southard v. Tex. Bd. of Criminal Justice*, 114 F.3d 539, 550 (5th Cir. 1997).

## B. Termination

Regarding Plaintiff's termination, Plaintiff claims that because she was fired at the recommendation of Smith, Ward, and potentially Safranek, and because they were retaliating against her for filing complaints with the Human Resources Department and the EEOC, they are individually liable.

Smith and Ward did not fire Plaintiff directly, but merely recommended her termination to Bruce and Purefoy. In *Culbertson v. Lykos*, the Fifth Circuit held that, as of 2015, "[i]t was unsettled . . . whether someone who is not a final decision-maker and makes a recommendation that leads to the plaintiff being harmed can be liable for retaliation under Section 1983." 790 F.3d 608, 627 (5th Cir. 2015). When Smith, Ward, and Safranek allegedly acted, "the law was not clearly established that a mere recommendation of termination to a higher authority who makes the final decision causes an adverse employment action" for purposes of retaliation. *See id.* Since Smith, Ward and Safranek did not cause the adverse employment action, they cannot be liable under § 1983.

It is undisputed that Plaintiff engaged in conduct protected by § 1981 when she filed a formal charge of race discrimination in April 2014 and attended a meeting with Safranek in August 2014 to complain about discrimination in the workplace. However, Plaintiff failed to present any precedent to suggest that a reasonable Chief of Police for the City armed with the knowledge he possessed, including the unsatisfactory performance reviews, would know they could not adopt a recommendation to terminate Plaintiff. Moreover, that recommendation exhibited no unconstitutional motive on its face. Further, the evidence suggests that Bruce fired Plaintiff for independent reasons, including her insubordination. Again, Plaintiff offers nothing but her own beliefs to the contrary.

With regard to her termination, the Court finds that all the Individual Defendants are entitled to summary judgement on the issue of qualified immunity claims.

**IV. Additional Claims**

After a careful review of the record and the arguments presented, the Court is not convinced that Defendant has met its burden demonstrating that there is no material issue of fact entitling it to judgment as a matter of law on Plaintiff's (1) civil conspiracy; (2) aiding and abetting claims; and (3) declaratory and injunctive relief. The case should proceed to trial on Plaintiff's remaining claims.

**CONCLUSION**

It is therefore **ORDERED** that Defendants' Motion for Summary Judgment (Dkt. #35) is hereby **GRANTED** in part and **DENIED** in part. Defendants' motion is granted as to all of Plaintiff's claims except her claims for (1) Title VII retaliation, (2) § 1981 and § 1983 retaliation claim against Defendant Smith in her individual capacity for issuing the PIP and negative performance review, (3) civil conspiracy, (4) aiding and abetting, and (4) declaratory and injunctive relief.

**IT IS SO ORDERED**.

**SIGNED this 15th day of November, 2017.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE